IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,    :
                                    :
v.                              :       CRIMINAL INDICTMENT NO.:
                                    :       2:17-CR-00028-RWS-JCF
DEONTAE THOMAS             :

## **ORDER and REPORT AND RECOMMENDATION**

This case is before the Court on Defendant's Motion To Suppress (Doc. 16).

For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion

be **DENIED**.

## **Procedural History**

An Indictment filed July 12, 2017 (Doc. 1) charges Defendant with possession

of heroin with intent to distribute, in violation of 18 U.S.C. §§ 841(a) and

841(b)(1)(C) (Count One); possession of methamphetamine with intent to distribute,

in violation of 18 U.S.C. §§ 841(a) and 841(b)(1)(B)(viii) (Count Two); and

possession of a firearm in furtherance of a drug trafficking crime in violation of 18

U.S.C. § 924(c)(1) (Count Three).  Defendant moved to suppress evidence seized

and any statements made by Defendant to law enforcement officers during a

December 2, 2016 traffic stop.  (Doc. 16).  The Court conducted a hearing on

Defendant's motion on May 17, 2018 (*see* Doc. 27), and the transcript was filed on

June 4, 2018 (Doc. 30).[1]  The Government filed a post-hearing brief (Doc. 32), Defendant responded (Doc. 34), and the Government submitted a reply (Doc. 35). Defendant filed a sur-reply (Doc. 36), to which the Government responded (Doc. 38).  With briefing complete, the Court now considers the merits of Defendant's motion.

## Discussion

### I.   Facts[2]

Habersham County Sheriff's Deputy Brandon Holcomb is assigned to a specialized traffic unit called the HEAT unit.  (Tr. 7).  That unit's mission is to reduce the number of traffic fatalities through education and enforcement, including "speed enforcement, DUI detection, seat belts, and child safety seats."  (Tr. 8-9). When he was transferred to that unit, Holcomb received specialized training in standardized field sobriety tests training, ARIDE (roadside drug impairment detection) training, Intox 5000, speed detection, lasers, radar detection, and drug interdiction.  (Tr. 9).  With respect to his field sobriety tests training, Holcomb took a three-day class and was required to demonstrate proficiency in "determining which subjects were under the influence and how much they are under the influence" in

---

[1] References to the transcript will be designated as "Tr. __."
[2] These facts are taken from the testimony of Brandon Holcomb, the Habersham County Sheriff's Deputy who conducted the traffic stop at issue, as well as a video recording of the traffic stop (Gov't Ex. 1 (Doc. 29)).

order to pass the class, which he passed.  (Tr. 9-10). That class used the National Highway Traffic Safety Administration Training Manual on Field Sobriety.  (Tr. 55-56).  Holcomb's ARIDE training, which he completed in 2015, was "geared towards drug impairment" and taught him how to conduct evaluations of drug impairment, including eye testing and effects of drugs on the human body.  (Tr. 10-11, 55). Holcomb estimates that he has done approximately 300 sobriety tests on drivers per year in the three years since he completed his training.  (Tr. 11).  He also goes to high schools to teach students how officers do sobriety tests and performs sobriety tests during those sessions.  (Tr. 11-12).   During Holcomb's drug interdiction training, he has learned interview techniques, how to detect deception during a traffic stop, and how people hide things, and he has used those techniques frequently since undergoing that training.  (Tr. 12-13).

On December 2, 2016, at 11:30 p.m. Deputy Holcomb was at an intersection on Highway 365 in the south end of Habersham County in Cornelia, Georgia where he had just finished a traffic stop and was turning to go back north to run speed detection. (Tr. 14-15, 25).  He was stopped at a red light approximately 10 cars back from the light when he saw a car in front of him that was weaving back and forth, in and out of traffic.  (Tr. 15-16).  As they were traveling, he saw that the driver—later identified as Defendant—failed to maintain his lane by "riding way right of center," and he made sudden lane changes to pass cars.  (Tr. 16-17).   In light of his

3

observations of aggressive driving and failure to maintain lane, Holcomb began watching Defendant's car and got behind him.  (Tr. 17).  There were several cars between Holcomb and Defendant, so Holcomb flashed his headlights at them to get them to move over to let him get directly behind Defendant, but he did not engage his blue lights at that time.  (Tr. 17).  Holcomb was able to get directly behind Defendant and estimated his speed at 80 miles an hour and activated his direction moving radar, which indicated that Defendant was traveling at 78 miles per hour in a 65 mile per hour zone.  (Tr. 18).  Holcomb noted that Defendant was still failing to maintain his lane, and he would weave from one lane to the other lane and cross center dashes without signaling.  (Tr. 19).  He went left and center with both of his left-sided tires again, so Holcomb decided to stop him and activated his blue lights.  (Tr. 19).  Holcomb was driving a marked patrol car which is equipped with a recording device that records from two minutes before his blue lights are activated until the deputy stops recording, and he also was wearing a microphone that records audio.  (Tr. 19-21).

Once Defendant and Holcomb pulled over, Holcomb got out of his vehicle and made contact with Defendant.  (Tr. 22-23).  There was also a woman in the front passenger seat.   (Gov't Ex. 1).  Holcomb was concerned that Defendant was impaired given that he was speeding and failing to maintain his lane.  (Tr. 23). Holcomb began talking with Defendant and "started assessing him as a driver," i.e.,

4

"look[ed] at his eyes, his body language, how he talks to [Holcomb]," whether he looked at Holcomb while talking and was responsive to Holcomb's questions. (Tr. 23-24). Holcomb did not smell alcohol or marijuana. (Tr. 59). Holcomb asked Defendant for his driver's license, asked him "what's your hurry," and told Defendant he was "all over the road." (Gov't Ex. 1). Holcomb asked Defendant where he was headed, and Defendant initially said he was going to Gainesville, but that did not make sense to Holcomb because they were already north of Gainesville and Defendant was heading north. (Tr. 24). Holcomb asked Defendant where he was staying, and he said he was on vacation and visiting family in Gainesville. (Tr. 25). Defendant also told Holcomb he was going to Walmart in Cornelia, which Holcomb also found dubious because Defendant could have gone to a Walmart in Gainesville where he was staying rather than drive to a Walmart in Cornelia that was 25 miles away. (Tr. 24-25).

As they spoke, Holcomb observed a cellphone on Defendant's dashboard with what appeared to be GPS software displaying "52 miles to your destination" and "a line going straight northbound," i.e., the GPS was not "telling them to turn around and go back towards Atlanta or Gainesville." (Tr. 25-26, 62). That raised Holcomb's suspicions because it was not consistent with what Defendant said about where he was going. (Tr. 26). He asked Defendant about it, and Defendant responded that it wasn't his phone, it was his female passenger's phone. (Tr. 26).

5

Holcomb also observed that Defendant would not look at him while they were talking but just looked at the steering wheel.  (Tr. 26).  Defendant appeared to be "getting aggravated with [Holcomb] asking those questions," which indicated "[c]riminal activity of some sort, deception" to Holcomb.  (Tr. 27).  Based on his training and experience, Holcomb suspected the criminal activity could involve narcotics.  (Tr. 27).

Holcomb then decided to separate Defendant from the passenger to interview them independently about where they were coming from and where they were staying.  (Tr. 27-28).  He opened the door and repeatedly told Defendant he wanted to speak with him outside the car and asked him to step outside, but Defendant asserted that he did not do anything wrong and did not exit the vehicle.  (Tr.  28; Gov't Ex. 1).  Holcomb repeated that he wanted to speak with Defendant outside the car, but Defendant again did not exit the car and instead continued to question why he needed to get out of the car.  (Gov't Ex. 1).  Holcomb then told him "I'm not giving you an option, you're going to get out of the car and get back here and talk to me ok?"  (Gov't Ex. 1).  Defendant did not immediately exit the car but said, "I understand all that, you've got my driver's license," and Holcomb repeated, "You're going to come back here and speak with me further ok?" and explained that Defendant was "all over the road, you can't drive, can't maintain your lane, and you're driving 78 miles per hour," so Holcomb "want[ed] to get back here and do a

6

few tests with you and make sure you're safe to drive.  That's your options right now, so how about stepping back here."  (Tr. 29, 63-64; Gov't Ex. 1).  Defendant then got out and put his hands on the roof of the car pursuant to Holcomb's direction.[3]  (Gov't Ex. 1). Holcomb did not see anything inside the car at that point that aroused suspicion, but he did find Defendant's reluctance to get out of the car to be suspicious because in his experience when he asked someone to step out of a vehicle during a traffic stop, they "normally . . . just step out" if they have nothing to hide.  (Tr. 28-30).

Holcomb asked Defendant for consent to search his person to make sure he did not have any weapons on him, and after telling Holcomb he did not have "anything" on him, Defendant gave his consent.  (Tr. 30, 64; Gov't Ex. 1).  Holcomb had not withdrawn his firearm or Taser at that point, and he spoke with Defendant in a conversational tone.  (Tr. 30-31; Gov't Ex. 1).  Holcomb noticed a bulge in one

---

[3] At the hearing Deputy Holcomb testified that when Defendant exited the car he immediately turned his body around, put his hands on the car, and blocked the interior of the car, which Holcomb found suspicious because that was not the typical behavior of people he has stopped; they normally begin walking to the back of their vehicle.  (Tr. 29).  He was also taught in one of his drug interdiction training courses "[t]hat's kind of the guilty position, to put their hands on a car . . . [a]nd blocking the view of the car where I can't see into the car."  (Tr. 29-30).  Holcomb later testified that he did not recall telling Defendant to put his hands on the car, but if he told him that then "him standing there would be appropriate[.]"  (Tr. 60).  The video shows that Holcomb told Defendant to put his hands on the car.  (Gov't Ex. 1).

of Defendant's pockets and asked him what it was, and he responded that it was money, "500 bucks." (Tr. 31). Holcomb found that carrying $500 in cash in one's pocket to be unusual. (Tr. 31).

Holcomb asked Defendant to step back to the front of his patrol vehicle, but Defendant "didn't want to do that." (Tr. 32). He "kept facing" Holcomb and asked, "Why, why are you doing this? What are you doing?" (Tr. 32). Because he was dealing with Defendant as well as the passenger in Defendant's vehicle, Holcomb felt the need to control the situation and raised his voice and told Defendant "Move to the front of my patrol vehicle," and Defendant then backed up to the back of Defendant's car but "kept putting his hand on the car and kept standing there." (Tr. 32; Gov't Ex. 1). Holcomb repeatedly told him to move to the front of his patrol vehicle but he did not comply, so Holcomb pointed his Taser at Defendant and again told him to move to the front of the patrol vehicle. (Tr. 32-33, 66; Gov't Ex. 1). Defendant put his hands in the air and backed up to the front of the patrol car. (Tr. 33, 66; Gov't Ex. 1). Holcomb then re-holstered his Taser. (Tr. 33). Holcomb asked him why he was being difficult and not complying with him, and Defendant responded, "I wasn't trying to do nothing like that. My question about what I was, I thought I did something wrong," and Holcomb again told him why he was investigating, i.e., whether Defendant was safe to drive. (Tr. 34; Gov't Ex. 1). Holcomb also told Defendant, "When an officer tells you to do something you do it.

8

You don't do what you think you want to do." (Gov't Ex. 1). Holcomb explained at the hearing that he wanted Defendant to move to the front of his patrol car because he intended to administer field sobriety tests and that area provided the best view for the camera, and it was the safest place for him and Defendant. (Tr. 33). Holcomb did not think he had probable cause to search Defendant's car at that point. (Tr. 70-71).

Another officer arrived, and Holcomb told him why he pulled Defendant over and that Defendant was nervous, giving evasive answers, the GPS indicated he was not being truthful about where he was going, and he would not comply with getting out of the car and moving to the front of the patrol car. (Tr. 33-34; Gov't Ex. 1). Holcomb asked the other officer to speak with the female passenger while he dealt with Defendant. (Tr. 34). Holcomb then asked Defendant whether he was on probation or parole, what he did for a living, and whether certain illegal substances or weapons were in the vehicle, including methamphetamine or heroin in the car. (Tr. 34-35, 71-72; Gov't Ex. 1). Defendant responded that there were not any, but Holcomb testified that "[e]very other question [Holcomb] asked him he added something to it. He either slurred his voice, he laughed, he giggled [but with] [t]hose two substances he stated no." (Tr. 34-35). Holcomb found Defendant's manner of answering his questions deceptive based on his training and experience. (Tr. 35, 72-73). Holcomb still did not think he had probable cause to search Defendant's car.

(Tr. 73-74).  Holcomb asked for consent to search the car, but Defendant refused, and Holcomb responded, "okay."  (Gov't Ex. 1).

Holcomb explained to Defendant that he wanted to administer field sobriety tests to Defendant because of how he was driving and asked him again about his travels.  (Gov't Ex. 1).  Defendant said that he was staying at a hotel in Gainesville and had been driving to Cornelia to go to Walmart because his passenger needed to get some toiletries, and that they planned to return to the hotel in Gainesville after going to the Walmart. (Gov't Ex. 1).  Holcomb prepared to begin the horizontal gaze nystagmus evaluation, but the second officer approached and also asked Defendant for consent to search the car, and Defendant again refused.  (Gov't Ex. 1).

Holcomb then moved to the passenger near the front passenger side of Defendant's vehicle and began questioning her to see if her story differed from Defendant's about where they were going.  (Tr. 36-37, 73-75; Gov't Ex. 1).  She told Holcomb she did not know where they were going, she had been asleep.  (Tr. 36, 61).  Holcomb responded that Defendant "says you're going to Walmart," and she said that Defendant said they were going to Walmart to get condoms and snacks. (Tr. 36; Gov't Ex. 1).  The passenger denied that she needed anything at Walmart. (Tr. 37).  The passenger did not know the name or location of the hotel where they were staying.  (Gov't Ex. 1).  Holcomb believed that the passenger's version about going to Walmart differed from Defendant's, which further heightened Holcomb's

suspicions.  (Tr. 37).  The passenger also said that the phone was hers and that the GPS had been on since she left Atlanta earlier in the day, but Holcomb found the information the GPS was displaying, i.e., indicating that the destination was 52 miles north of the traffic stop, was inconsistent with the information Defendant and the passenger gave about where they were going (Tr. 25-26, 62), i.e. to a Walmart in Cornelia and then back to Gainesville.

As he was walking back from questioning the passenger, Holcomb looked inside Defendant's vehicle through the window, shined a light in the car, and saw behind the passenger seat two to three inches of a tightly wrapped cellophane bundle with a square top sticking out of what appeared to be a bag underneath a jacket.  (Tr. 38, 75).  Given how the bundle was wrapped he immediately suspected it was narcotics, probably methamphetamine, based on his training and experience, although he could not see through the cellophane.  (Tr. 38-39).  Holcomb then placed Defendant in handcuffs and told him he was detaining him for the officers' safety and left him leaning up against the front of the patrol car.  (Tr. 42, 78; Gov't Ex. 1). That occurred approximately 14 minutes after he pulled over Defendant.  (Gov't Ex. 1).  Defendant then pointed the bundle out to other officers at the scene and they indicated that it looked like "dope."  (Gov't Ex. 1).

Holcomb believed that he had probable cause to obtain a search warrant and called a magistrate judge to begin the process.  (Tr. 40).  He told her the facts that

he had to that point, "what the stories were, what they were telling me, how they were acting, and then what I had [seen]," and she told him she thought he had enough for a warrant. (Tr. 41; Gov't Ex. 1). But she told him that he would have to tow the car, detain the passengers, and come meet her. (Tr. 40). Holcomb told her that he had some field sobriety tests and DUI investigation to complete, and the judge told him he might not need her. (Tr. 40). Holcomb decided to complete his investigation and call the judge back if he needed to meet with her. (Tr. 40-41). He asked to get a drug dog there, but it was an hour away. (Tr. 79-80; Gov't Ex. 1).

Holcomb exited his patrol car and read Defendant his *Miranda* rights and removed him from handcuffs in order to perform the field sobriety tests. (Tr. 42; Gov't Ex. 1). Before the other officer arrived and prior to speaking with the magistrate judge, Holcomb had looked at Defendant's eyelid tremors and his conjunctiva and considered his speech, but he had not conducted any field sobriety tests to assess impairment. (Tr. 42-43). Holcomb asked Defendant if he would do some field sobriety evaluations to make sure he was safe to drive, and Defendant said yes. (Tr. 43; Gov't Ex. 1). Approximately 24 minutes had elapsed from the beginning of the stop. (Gov't Ex. 1). Holcomb observed Defendant's tongue and eyes under a flashlight. (Gov't Ex. 1). Holcomb asked Defendant about the cellophane-wrapped bundle in his car, and Defendant responded that he did not know but indicated it was just trash. (Tr. 77; Gov't Ex. 1). Holcomb also asked

12

Defendant about the last time he smoked marijuana and again looked at his eyes and tongue with a flashlight, and Defendant responded that the last time he smoked marijuana was months earlier.  (Gov't Ex. 1).

Holcomb removed Defendant's handcuffs and began the field sobriety tests. (Gov't Ex. 1).  First, he administered the horizontal gaze nystagmus test, which measures involuntary jerking of the eyes and moving from side to side.  (Tr. 43-44). Holcomb noted that Defendant was wearing contacts, confirmed that he had equal pupil size, and began the test.  (Tr. 80-82; Gov't Ex. 1).  Defendant followed his directions and no nystagmus was present, indicating there was no alcohol impairment, although Holcomb noted that Defendant's body swayed in a circular motion during the test.  (Tr. 44, 84-85).  Holcomb did not conduct a lack of convergence test because of concerns about Defendant's contacts.  (Tr. 87).  He did look at Defendant's conjunctiva with a flashlight and observed marked reddening under the lower eyelids of both eyes.  (Tr. 50).

Holcomb then administered the walk-and-turn evaluation, instructed Defendant how to perform it, then watched for clues of impairment as Defendant performed the test; he "did seven of the eight wrong" which indicated impairment equivalent to an alcohol concentration of .08 grams or more.  (Tr. 45-47).  He next administered the one-leg stand test, and Defendant performed three of the four clues for impairment incorrectly, which also indicated impairment equivalent to an alcohol

concentration of .08 grams or more.  (Tr. 47-48).  Holcomb also believed that Defendant was sufficiently impaired to arrest him for DUI because Defendant's tongue had red raised bumps on it, the top of his tongue was green, and there was marked reddening of his conjunctiva, observations which were consistent with what he had learned about marijuana use in his training and experience.  (Tr. 49-50,77-78, 90-92).

Deputy Holcomb then arrested Defendant for driving under the influence of alcohol or drugs based on his speeding and failing to maintain his lane, his observations of characteristics consistent with marijuana use, and Defendant's performance on the field sobriety tests.  (Tr. 50-51, 90).  Officers searched the car and found three large bundles of narcotics, which Holcomb believed were methamphetamine based on how they felt.  (Tr. 51-52, 78).  They also found methamphetamine in the passenger's purse, a pill in Defendant's wallet, and a loaded firearm between the seats.  (Tr. 52).  The passenger was placed under arrest for possession of methamphetamine. (Tr. 52).  Defendant's car was towed and he and the passenger were arrested.  (Tr. 52-53).

## II.   **Analysis**

Defendant argues that the Court should suppress all evidence seized from his vehicle without a warrant and any evidence of statements he made to Deputy Holcomb.  (Doc. 16).

### A.     <u>Seizure of Evidence From Defendant's Car</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.  "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' "  *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  Where a seizure is made without a warrant, as in this case, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

To determine whether the search of Defendant's vehicle violated the Fourth Amendment, the Court must ascertain the legality of: (1) the initial stop; (2) Defendant's detention; (3) Defendant's arrest; and (4) the warrantless search of his vehicle.

### 1.     <u>Traffic Stop</u>

"The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."  *United States v. Allen*, 274 Fed. Appx. 811, 817 (11th Cir. 2008) (unpublished decision)

(citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)).  "Such an automobile stop is reasonable and constitutional, however, if it is based on either probable cause to believe that a traffic violation has occurred or reasonable suspicion that a crime has been or will be committed."  *Allen*, 274 Fed. Appx. at 817-18 (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003)); *See also United States v. Purcell*, 236 F.3d 1274, 1276, n.5 (11th Cir. 2001) (stating that "[a] law enforcement officer may legally stop an automobile traveling on the highways if he has probable cause to believe that a traffic violation has occurred" and citing *Whren*, 517 U.S. at 810).

The Court finds that Deputy Holcomb had probable cause to stop Defendant's vehicle based on his observation of the vehicle failing to maintain its lane in violation of O.C.G.A. § 40-6-48 and speeding in violation of O.C.G.A. § 40-6-181.  *See, e.g.*, *United States v. Garcia*, 284 Fed. Appx. 791, 793 (11th Cir. 2008) (unpublished decision) (the officer's observation of the defendant's failure to maintain his lane provided probable cause for the stop).  In addition to the probable cause based on the observed traffic violation, Deputy Holcomb reasonably suspected that the driver was impaired by drugs or alcohol, based on his training and experience and observations about how the car was being operated, i.e., speeding, weaving, making sudden lane changes, and crossing over the line into the other lane.  (Tr. 15-19, 23).

Accordingly, the Court finds that the traffic stop did not violate the Fourth Amendment.

### 2.   Defendant's Detention

Once Deputy Holcomb had stopped Defendant's vehicle, he was authorized to detain Defendant in order to investigate the circumstances justifying his decision to stop.  " 'An officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place,' and the stop 'may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.' " *Garcia*, 284 Fed. Appx. 794 (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)); *see also United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) ("Under *Terry v. Ohio*, an officer's investigatory detention must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' " (quoting *Terry*, 392 U.S. 1, 20 (1984)).  In evaluating the reasonableness of an investigatory detention, courts consider the "totality of the circumstances," and "[t]here are several issues relevant to this analysis, 'including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000).

Deputy Holcomb reasonably asked Defendant questions concerning why he was speeding and why he failed to maintain his lane and about his travels, including where he and his passenger were coming from and where they were going, questions that are reasonably related to the purpose of the stop, i.e., to investigate the observed traffic infractions as well as the suspected impairment of the driver.[4] " 'It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop.' " *United States v. Jaramillo*, No. 1:13-cr-00308-JEC-RGV, 2014 U.S. Dist. LEXIS 91027, at *27 (N.D. Ga. Apr. 25, 2014) (quoting *United States v.* Ellis, 497 F.3d 606, 614 n.1 (6th Cir. 2007)), *adopted by* 2014 U.S. Dist. LEXIS 89752 (N.D. Ga. July 1, 2014).   In questioning Defendant, Holcomb became suspicious that Defendant was engaged in criminal activity—aside from the traffic infractions for which he pulled him over—based on his observations that Defendant did not look at him while being questioned, appeared to be "aggravated" by his questions, and gave inconsistent and implausible responses to Holcomb's questions about his travel plans.  Specifically, Defendant initially said he was going to Gainesville, but he was already north of Gainesville and traveling northbound.  (Tr. 24).  He then said that

---

[4] Defendant asserts that "[a]t this point, there is no evidence that the deputy was suspicious that Mr. Thomas [was] under the influence of drugs or alcohol."  (Doc. 34 at 4).  To the contrary, Deputy Holcomb testified that at the outset of the traffic stop, he was concerned that Defendant was impaired given how he was driving the car.  (Tr. 23).

18

he was coming from Gainesville to go to a Walmart in Cornelia, which Holcomb questioned given that that is a 25-mile distance from Gainesville, where there is a Walmart.  (Tr. 24-25).   And Defendant's explanation that he was traveling from Gainesville to Cornelia appeared inconsistent with the GPS display indicating that Defendant's destination was 52 miles north of the traffic stop.[5]  (Tr. 25-26, 62).  Deputy Holcomb was therefore justified to prolong the stop to continue investigating the reasons for Defendant's traffic infractions as well as his reasonable suspicion of criminal activity.

Holcomb further reasonably directed Defendant to exit the vehicle[6] and walk to the front of his patrol car in order to separate him from his passenger, to question him away from traffic, and to record him from his patrol car's camera while

---

[5] Defendant asserts that "[t]he persistent interrogation expanded to questions about the private contents of his passenger's cell phone," (Doc. 34 at 3), presumably referring to Holcomb's observation that the cell phone displayed GPS directions to a destination that was 52 miles north of the traffic stop.  Defendant posits that "[t]he indication of '52 miles' on the phone could have been directions to home and would therefore be consistent with Mr. Thomas's explanation he was from Atlanta and not familiar with this part of Georgia."  (*Id*. at 3 n.3).  Given Defendant's statement to Holcomb that he was going to a Walmart there in Cornelia from Gainesville, which is south of the location where the stop occurred, Holcomb reasonably believed that the GPS display contradicted Defendant's statements about the destination and purpose of his travel that night.

[6] Defendant asserts that Holcomb asked him to exit the vehicle "[a]fter this fairly lengthy interrogation[.]"  (Doc. 34 at 4).  The video shows that Holcomb only questioned Defendant for a few minutes before asking him to step out of the car. (Gov't Ex. 1).

Holcomb investigated whether he was impaired.[7]  The stop occurred at night by the side of the road and Holcomb was by himself when he first encountered Defendant and the passenger.  Holcomb's steps to take control of the situation to protect himself while he conducted his investigation were reasonable and did not violate the Fourth Amendment.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (explaining that requiring motorist to exit car during traffic stop is "at most a mere inconvenience" which is outweighed by "legitimate concerns for the officer's safety" and therefore reasonable under the Fourth Amendment); *Jaramillo*, 2014 U.S. Dist. LEXIS 91027, at *26 ("[T]here is nothing unconstitutional about ordering the driver of a vehicle lawfully detained for a traffic violation to get out of the vehicle.").  Nor did that order convert the investigative stop into an arrest.  *See United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983) (explaining that "an investigative stop does not become an arrest merely because an officer directs the subject of an investigation out of a vehicle").

---

[7] Defendant contends that "[a]t this point, Deputy Holcomb had committed his focus to a criminal investigation/interrogation related to his suspicion there were narcotics in the vehicle" and "abandoned pursuit of the traffic violations which formed the basis of the stop." (Doc. 34 at 4).  The undersigned disagrees.  The video shows that Holcomb clearly told Defendant he wanted investigate whether he was impaired or safe to drive the vehicle, which is one of the reasons why he stopped Defendant. (Gov't Ex. 1).  The fact that he was also suspicious of other criminal activity given how Defendant was behaving and responding to his questions does not indicate that he had abandoned his investigation of the reasons for the traffic stop.

Moreover, Holcomb did not act unreasonably when he pointed his Taser at Defendant after Defendant repeatedly failed to comply with his directive to move to the front of his patrol car.  Nor did that action transform the *Terry* stop into an arrest at that time.  Deputy Holcomb was alone, conducting a traffic stop late at night by the side of the road and contending with Defendant and another passenger; Defendant was acting nervously and providing responses about his travels which heightened Holcomb's suspicions about criminal activity; Defendant had demonstrated resistance to his repeated requests to exit the vehicle; and he did not immediately comply with Holcomb's directions to go to the front of his patrol car. The undersigned finds that Holcomb reasonably (and only briefly) pointed his Taser at Defendant to get him to comply with his lawful directive to move to the front of the patrol car.  *See Roper*, 702 F.2d at 987-88 (explaining that "an officer's display of weapons does not necessarily convert an investigatory stop into an arrest" and finding that the officer did not act unreasonably in that case by drawing his gun because he "was alone, approaching a vehicle with two adult males inside, one of whom was possibly a federal fugitive").

Holcomb was also authorized to question the passenger separately in order to determine whether her account differed from Defendant's.  *See, e.g.*, *Jaramillo*, 2014 U.S. Dist. LEXIS 91027, at *27-33 (finding that the trooper's separate questioning of the occupants during a traffic stop to determine if their accounts differed was

within the permissible scope of the traffic stop).  Holcomb found her explanation to be inconsistent with Defendant's—Defendant told Holcomb that they were going to Walmart to get toiletries for his passenger, but she told Holcomb that Defendant had said they were going to get condoms and snacks, and she denied that she needed anything at Walmart.  (Tr. 36-37).  Holcomb also found her explanation as to why the GPS indicated that their destination was 52 miles to the north of the traffic stop to be inconsistent with her response that she had come from Atlanta and just left the GPS on.  (Tr. 25-26, 62).  Holcomb's suspicions were not alleviated by the passenger's responses, and he was therefore authorized to continue to detain Defendant to investigate his reasonable suspicions that criminal activity had or was occurring.

It was while he walked past Defendant's car after speaking with the passenger that he saw behind the passenger seat a bundle tightly wrapped in cellophane consistent with his training and experience with how illegal narcotics are packaged, at which point he believed that Defendant had illegal narcotics in his car, and thus continued detaining Defendant to investigate.  The fact that he then handcuffed Defendant does not indicate that the detention was unreasonable.  *See, e.g.*, *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents."); *United States v. Kapperman*, 764 F.2d 786, 790 n.4

(1985) (explaining that handcuffing or restraining a detainee does not automatically convert a *Terry* investigative detention into an arrest, and "[p]olice may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo").

Holcomb continued to take reasonable steps to investigate his suspicions by attempting to obtain a search warrant and get a drug dog to perform a canine sniff.[8] (Tr. 40-41, 79-80). Those options were not quickly available, however. (*Id.*). Holcomb has also asked Defendant for consent to search the vehicle, but Defendant refused to give his consent. (Gov't Ex. 1). Holcomb then obtained Defendant's consent to take field sobriety tests to determine if he was impaired or safe to drive his car, removed Defendant's handcuffs, and administered the field sobriety tests. The results of those tests—along with his observations of Defendant's driving in an

---

[8] Defendant contends that "the deputy was really operating on a hunch there were drugs in the car (and not conducting a traffic/DUI investigation" because "no field sobriety tests were given until after a Magistrate Judge refused to give him a warrant to search the car." (Doc. 34 at 5). The undersigned disagrees. Holcomb discussed doing field sobriety tests before he saw the bundle and called the magistrate judge. Once Holcomb observed what appeared to be illegal narcotics in the vehicle, he was still investigating the original reasons for the stop, i.e., whether Defendant drove his car in an unsafe manner because he was impaired, and he was also investigating whether Defendant was transporting illegal narcotics. Nor does the evidence show that the Magistrate Judge "refused to give him a warrant"; Holcomb's unrebutted testimony is that the judge directed him to tow the car, detain the passengers, and come meet her. (Tr. 40). Given the time that would have taken, Holcomb then chose to pursue other means of investigation, including administering the field sobriety tests he had previously discussed. (Tr. 40-41).

unsafe manner and his observations of Defendant's eyes and tongue—indicated to Deputy Holcomb that based on his drug impairment training and experience, Defendant had been driving under the influence of alcohol or drugs and therefore arrested him.  (Tr. 45-51, 77-78, 90-92).

The undersigned finds that Deputy Holcomb diligently pursued methods designed to investigate the observed traffic offenses, Defendant's suspected impairment, and Holcomb's suspicions that the car contained illegal narcotics.  The scope, intrusiveness, and duration of the detention were reasonable in light of the purposes served by the detention and the evolving circumstances which heightened the agents' suspicions as the encounter with Defendant continued, i.e., "[e]ach investigatory act logically led to the next act which was done without delay." *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004).  The video shows that the duration of the encounter lasted approximately 37 minutes from the initial stop until Defendant was placed under arrest following the field sobriety tests.  (Gov't Ex. 1). Given the steps Holcomb took to investigate his suspicions, the undersigned finds that the investigatory detention was reasonable and did not impermissibly ripen into an arrest without probable cause in violation of the Fourth Amendment.  *See, e.g.*, *United States v. Lester*, 477 Fed. Appx. 697, 701 (11th Cir. 2012) (finding that 30 to 40 minute detention was reasonable and did not exceed the scope of detention allowed under *Terry*); *Gil*, 204 F.3d 1350-51 (finding that 75-minute investigative

24

detention during which the defendant was handcuffed in a police car was not unreasonable where the agents "detained [her] for only as long as it was necessary to complete their investigation of the residence," and handcuffing and detaining her in the police car was reasonable in order to "maintain the safety of the officer and the ongoing investigation of the residence").

### 3.    <u>Defendant's Arrest</u>

"Law enforcement officers may constitutionally make a warrantless arrest where they have probable cause to believe a suspect has committed a crime." *United States v. Maddox*, No. 3:10-CR-004-JEC-RGV, 2010 U.S. Dist. LEXIS 112847, at *23 (N.D. Ga. Sept. 7, 2010), *adopted by* 2010 U.S. Dist. LEXIS 112826 (N.D. Ga. Oct. 22, 2010). "Probable cause to arrest exists 'when an arrest is "objectively reasonable based on the totality of the circumstances." ' " *Id.* at *23-24 (quoting *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002))). "The standard of objective reasonableness 'is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonable trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Id.* at *24 (quoting *Rankin*, 133 F.3d at 1435 (internal quotation omitted)). "Prior to making an arrest, an officer need not prove all elements of a crime beyond a reasonable doubt, nor do

all facts supporting probable cause at the time of arrest need to be admissible according to the rules of evidence." *Id*. at *25. "Moreover, an officer need not resolve all inferences and factual conflicts in favor of the suspect. 'An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect.' " *Id*. (quoting *Bailey v. Bd. of Cnty Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992)).

The undersigned finds that Deputy Holcomb had probable cause to arrest Defendant for driving under the influence of drugs in violation of O.C.G.A. § 40-6-391(a)(2) (providing that "a person shall not drive or be in actual physical control of any moving vehicle while . . . [u]nder the influence of any drug to the extent that it is less safe for the person to drive"). Holcomb testified about his training and experience with detecting impaired drivers, including both drug and alcohol impairment. (Tr. 9-13, 55). He testified that he arrested Defendant for DUI based on his observations of Defendant driving in an unsafe manner—speeding, weaving in and out of his lane, and crossing into other lanes without signaling; his observations of Defendant's physical appearance which were consistent with his training and experience with people who have smoked marijuana, including raised and red taste buds on his tongue (which was a green hue), bloodshot eyes, marked

26

reddening of the conjunctiva under the lower eyelids of both eyes; and his observations of how Defendant performed on the field sobriety tests. (Tr. 45-51, 77-78, 90-92). Specifically, Holcomb noted that during the walk-and-turn test Defendant failed to balance during the instructional phase several times; he stepped off the line several times when he started to walk; he missed heel to toe several times; he raised his arms for balance and then stopped at the turn; he performed an incorrect turn and walked an incorrect number of steps. (Tr. 46-47). During the one-leg stand test Defendant placed his foot on the ground to regain his balance three times, he swayed several times, and he raised his arm for balance several times. (Tr. 48). Even though Defendant was more than 65 pounds overweight and claimed to have "bad balance" (*see* Tr. 83-86), some of the difficulties Holcomb described, particularly with the walk-and-turn test did not involve balance issues but involved Defendant not following Holcomb's instructions about stopping at the turn, performing the turn correctly, and walking a certain number of steps. (Tr. 46-47).

Defendant argues that probable cause did not exist to arrest him, however, because Holcomb did not comply with National Highway Traffic Safety Administration (NHTSA) guidelines for administering the field sobriety tests.[9]

---

[9] Defendant also argues that the field sobriety tests were administered involuntarily (Doc. 34 at 19), but the undersigned finds otherwise. As discussed below, Holcomb advised him of his *Miranda* rights before asking him if he agreed to do the field sobriety tests and Defendant agreed to do them. Holcomb did not threaten Defendant or point his weapon at him to coerce him to agree to the tests. It is true that at the

(Doc. 36 at 14-16).  Defendant has not shown that compliance with NHTSA guidelines is a prerequisite for a court to consider an officer's observations of a suspect's performance on field sobriety tests in making a probable cause determination, and persuasive authority indicates otherwise.  *See Cann-Hanson v. State*, 223 Ga. App. 690, 691, 478 S.E.2d 460 (Ga. Ct. App. 1996) ("Contrary to Cann-Hanson's contention, the results of the field sobriety tests constituted admissible evidence of probable cause to support the arrest, despite evidence that the arresting officer did not fully comply with every [NHTSA] guideline for administration of the tests," which "affected only the weight and credibility of the behavioral observations of the officer" as to the "walk and turn" and "leg lift" tests); *see also Reiver v. D.C.* , 925 F. Supp. 2d 1, 10-11 (D. D.C. Feb. 22, 2013) (finding that "even if the instructions [the officer] gave" about doing the field sobriety tests "did not comport with official protocol, the fact that plaintiff failed to follow them as given is itself evidence that he might have been impaired).  The undersigned finds that Defendant's performance during the field sobriety tests contributes to a finding

---

beginning of the traffic stop Holcomb had ordered Defendant to exit the vehicle to talk to him and pointed a Taser at him to get Defendant to move to the front of his patrol car as directed, the tense atmosphere surrounding those directives had given way to a more conversational tone, and the video does not show that Holcomb coerced Defendant into agreeing to do the field sobriety tests.  And while Holcomb had earlier told Defendant, "you do what an officer tells you to do" after Defendant failed to comply with his directives, Holcomb did not command or demand Defendant take the field sobriety tests.  Instead, Holcomb asked if he would take them, and Defendant agreed and voiced no objection.  (Gov't Ex. 1).

of probable cause to believe that Defendant was driving under the influence of drugs when considered in combination with Holcomb's observations of Defendant's unsafe operation of his car, physical characteristics consistent with marijuana use based on Holcomb's training and experience, and Defendant's demeanor and behavior during the traffic stop, including giving inconsistent and non-credible responses concerning his travels and his delayed compliance with Holcomb's directives to get out of the car and to move to the front of Holcomb's patrol car.

Moreover, as discussed below, Deputy Holcomb had probable cause to believe that Defendant's car had illegal narcotics inside, and therefore even if probable cause did not support his arrest for DUI, the search of the vehicle was authorized under the automobile exception to the warrant requirement and therefore suppression of evidence found in the car is not required. *See United States v. Blasco*, 702 F.2d 1315, 1325-25 (11th Cir. 1983) (explaining that probable cause to search is a different standard from probable cause to arrest, i.e., "[p]robable cause to search exists where the facts warrant a reasonably cautious person to believe that objects sought in connection with a crime will be found" (citing *United States v. Melvin*, 596 F.2d 492 (1st Cir. 1979) (even if police do not have probable cause to arrest, property may be searched upon probable cause to believe that evidence of the crime may be found)).

### 4.   **Search of Defendant's Car**

The undersigned finds that the deputies' warrantless search of Defendant's car was authorized by the automobile exception to the warrant requirement.[10] That exception "allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "[O]fficers can [also] search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime." *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). "The mobility requirement is satisfied whenever the vehicle to be searched is operational." *United States v. Garcia*, 433 Fed. Appx. 741, 744 (11th Cir. 2011) (unpublished decision) (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). "A functioning vehicle is considered to be 'mobile' even if it already has been secured by the police." *Id.* (citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) and *United States v. Birdsong*, 982 F.2d 481, 483 (11th Cir. 1993)). "Police have probable cause to search a vehicle when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Id.* (internal quotations omitted).

---

[10] The Supreme Court in *Arizona v. Gant*, 556 U.S. 332, 343 (2009) "placed limitations on searches incident to arrest; it did not affect the longstanding law regarding the automobile exception to the search warrant requirement." *United States v. Ilonzo*, No. 1:12-CR-276-SCJ-GGB, 2015 U.S. Dist. LEXIS 136783, at *49 (N.D. Ga. May 18, 2015), *adopted by* 2015 U.S. Dist. LEXIS 135895 (N.D. Ga. Oct. 6, 2015).

Here, the vehicle was clearly mobile, as testified to by Deputy Holcomb and as seen in the video of the traffic stop.  Moreover, the undersigned finds that there was probable cause to believe that the car contained contraband or evidence of a crime, including the intoxicant believed to have impaired Defendant's ability to drive safely or evidence of illegal narcotics.  The following evidence contributed to a finding of probable cause: Defendant's unsafe driving, including speeding, failing to signal lane changes, and failure to maintain his lane; his responses to Holcomb's questions about his travels, which were inconsistent with the passenger's and with the GPS display and implausible given their location; his lack of cooperation in exiting the vehicle and in moving to the front of the patrol car as directed; his manner of responding to Holcomb's questions, which appeared evasive and deceptive; the appearance of his tongue and eyes, which were consistent with Holcomb's training and experience with people who had smoked marijuana; his possession of a large amount of cash in his pocket; Holcomb's observation of a bundle in the vehicle packaged in a manner similar to the way drug traffickers package narcotics, i.e., tightly wrapped in cellophane, partially hidden by a jacket; and Holcomb's observations of Defendant's performance during the field sobriety tests indicating impairment.  The undersigned finds that the totality of these circumstances support a finding that the deputies had probable cause to believe that Defendant's car

contained contraband or evidence of a crime.  The automobile exception to the warrant requirement therefore authorized the search of the vehicle.

Because Deputy Holcomb did not violate the Fourth Amendment by stopping Defendant's vehicle, detaining Defendant, arresting him, or searching his vehicle, the seizure of evidence from the vehicle did not violate the Fourth Amendment.   It is therefore **RECOMMENDED** that Defendant's motion to suppress that evidence be **DENIED**.

## II.   <u>Defendant's Statements</u>

To the extent that Defendant moves to suppress his statements as being obtained in violation of his Fourth Amendment rights, it is **RECOMMENDED** that motion be denied because as discussed above, the undersigned finds that his Fourth Amendment rights were not violated.

Defendant also moves to suppress his statements on the grounds that he was not advised of his *Miranda* rights, and his statements were not voluntary.  (*See* Doc. 16 at 3). "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Specifically, before a

person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him.  *Id*. at 467-73. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444.

It is well-settled, however, that "[p]re-custodial questioning does not require *Miranda* warnings." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing *United States v. Brown*, 441 F.3d 1330, 1347-49 (11th Cir. 2006)).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Street*, 472 F.3d at 1309 (original formatting altered) (quoting *Brown*, 441 F.3d at 1347).  In *Street*, the Eleventh Circuit explained that the definition of "custody" for *Miranda* purposes is not the same as the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for *Miranda* purposes.  The standards are different.  The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police.  By contrast, a person is in "custody" for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

33

*Street*, 472 F.3d at 1309-10 (internal citations omitted) (quotation marks omitted); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing *Street*, 472 F.3d at 1310)).  The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person."  472 F.3d at 1309.  Thus, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' " *Id.* (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)); *see also United States v. Dix*, No. 3:12-cr-00007-TCB-RGV, 2013 U.S. Dist. LEXIS 22476, at *12 (N.D. Ga. Jan. 29, 2013) ("[F]actors relevant to this determination include, but are not limited to, the location of the interview, the existence of any physical restraints

34

such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."), *adopted by* 2013 U.S. Dist. LEXIS 21902 (N.D. Ga. Feb. 19, 2013); *United States v. Johnson*, No. 2:12-cr-92-FtM-29DNF, 2013 U.S. Dist. LEXIS 108849, at *58 (M.D. Fla. Feb. 8, 2013) ("Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning."), *adopted by* 2013 U.S. Dist. LEXIS 108850 (M.D. Fla. Aug. 2, 2013).   "No one fact is determinative of the issue of whether the interview was custodial or not." *Id.* at *59.

"Unless restraint of an individual by law enforcement personnel is 'significant,' *Miranda* warnings are not required."   *United States v. Montos*, 421 F.2d 215, 222-23 (5th Cir. 1970).   Furthermore, it is the defendant's burden to establish that he was in custody for purposes of *Miranda*.  *See United States v. Asher*, No. 1:09-CR-414-JOB/AJB, 2010 U.S. Dist. LEXIS 112783, at *22-23 (N.D. Ga. Feb. 25, 2010) ("[A] defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning."), *adopted by* 2010 U.S. Dist. LEXIS 112823 (N.D. Ga. Oct. 21, 2010).

Regardless of whether *Miranda* warnings are required, "the court must still rule on the confession's voluntariness." *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (citations omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (noting that voluntariness is determined by the totality of the circumstances). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

## A.     <u>Statements Made Before *Miranda* Warnings</u>

When Deputy Holcomb initiated the traffic stop, he questioned Defendant while Defendant was in his car and continued questioning him after Defendant exited his car about a number of topics, including his travels, why he had been driving the way he was driving, whether there was anything in the car such as guns, bombs, drugs, etc. Holcomb did not give Defendant *Miranda* warnings prior to questioning

him, but the undersigned finds that Defendant has not shown that he was in custody for purposes of *Miranda* at that point and therefore *Miranda* warnings were not required.  Holcomb did not tell Defendant he was under arrest, he did not restrain him, and other than briefly pointing his Taser at Defendant when Defendant did not move to the front of the patrol car as directed, and the deputies did not point their weapons at Defendant or threaten him.  Other than his initial commands to Defendant to get out of the vehicle and then move to the front of his patrol car, Holcomb spoke with Defendant in a calm, conversational manner.  (*See* Gov't Ex. 1).

Although Defendant was not free to leave while Holcomb investigated the reasons for the traffic stop, that fact does not prove that Defendant had been subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Street*, 472 F.3d at 1309.  *See Acosta*, 363 F.3d at 1147 (explaining that "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car" (internal citations omitted)); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (stating that "the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory detention into an arrest"); *United States v. Jackson*, No. 1:15-cr-00284-AT-JKL, 2017 U.S. Dist. LEXIS

221421, at \*22 (N.D. Ga. Sept. 27, 2017) ("The Supreme Court has recently reaffirmed that 'the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.' " (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)), *adopted by* 2018 U.S. Dist. LEXIS 116410 (N.D. Ga. July 12, 2018); *United States v. Parker*, No. 1:10-CR-0176-JEC-JFK, 2010 U.S. Dist. LEXIS 133789, at \*30 (N.D. Ga. Nov. 18, 2010) (finding that defendant was not in custody for purposes of *Miranda* where he was detained and handcuffed during a drug investigation, where the detective told the defendant that "he was being detained, that is, that he was not under arrest," the detective had drawn his weapon but holstered it before questioning defendant, and the "detective's tone of voice was 'very laid back'; he did not yell; and he did not threaten Defendant"), *adopted by* 2010 U.S. Dist. LEXIS 133787 (N.D. Ga. Dec. 18, 2010).

The undersigned also finds that Defendant's pre-*Miranda* statements were made voluntarily, and Holcomb's actions in obtaining Defendant's compliance with his lawful orders do not undermine that finding. Holcomb explained why he stopped Defendant and why he wanted to conduct additional investigation into whether Defendant was safe to drive his vehicle, and when he was questioning Defendant, Holcomb used a calm, conversational tone, he did not threaten Defendant or make any promises to him, and he did not display his gun or Taser as he questioned Defendant. (Gov't Ex. 1). Under these circumstances, the undersigned finds that

the Government has proven that Defendant's pre-*Miranda* statements were "the product of the accused's free and rational choice." *Jones*, 32 F.3d 1512, 1516. *See, e.g.*, *United States v. Jackson*, No. 1:15-CR-00159, 2016 U.S. Dist. LEXIS 61695, at *36-37 (N.D. Ga. Mar. 22, 2016) (finding that defendant's statements made during traffic stop were voluntarily made even where officers grabbed the defendant's arm to remove him from the vehicle because he refused to obey commands to open his window, held his arm while he was escorted to the patrol vehicle, and handcuffed him to prevent him from fleeing because their voices were only raised when he failed to comply with commands but the officer used a "normal tone of voice when he questioned Defendant"), *adopted by* 2016 U.S. Dist. LEXIS 61486 (N.D. Ga. May 9, 2016).

### B.   Statements Made After *Miranda* Warnings

Deputy Holcomb placed Defendant in handcuffs after seeing the cellophane wrapped package in his car approximately 14 minutes after initiating the traffic stop and advised him of his *Miranda* rights.  (*See* Gov't Ex. 1).   Regardless of whether Defendant was in custody at that point, Deputy Holcomb advised Defendant of his *Miranda* rights and therefore his statements made after those warnings are not subject to suppression on the grounds that no *Miranda* warning were given. Furthermore, the undersigned finds that Defendant knowingly and voluntarily waived his rights under *Miranda* and voluntarily responded to Holcomb's questions.

39

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010); *see also United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010 (explaining that a defendant may waive his *Miranda* rights, "but only if 'the waiver is made voluntarily, knowingly and intelligently.' " (quoting *Miranda*, 384 U.S. at 444)).  "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Thompkins*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The Government bears the burden of proving both "dimensions" by a preponderance of the evidence. *Bushay*, 859 F. Supp. 2d 1335, 1372 (N.D. Ga. 2012) (citing *Thompkins*, 560 U.S. at 384); *see also Bernal-Benitez*, 594 F.3d at 1318 ("The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.").  "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Moran*, 475 U.S. at 421

(quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Bushay*, 859 F. Supp. 2d at 1373 ("A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension."). "The prosecution . . . does not need to show that a waiver of *Miranda* rights was express," however. *Thompkins*, 560 U.S. at 384. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence."

The undersigned finds that the Government has met its burden of proving that Defendant knowingly and voluntarily waived his *Miranda* rights. Holcomb advised Defendant of his *Miranda* rights and Defendant then at least implicitly waived his rights when he voluntarily responded to Holcomb's questions without an attorney present. Although Holcomb had initially commanded Defendant to exit his vehicle and pointed his Taser at Defendant to obtain compliance with his directive to go to the front of Holcomb's patrol car, by the time Holcomb handcuffed Defendant, Holcomb was not pointing a weapon at Defendant or threatening him, but instead he spoke with Defendant in a calm and conversational manner, and Defendant was standing up leaning against the patrol car. (*See* Gov't Ex. 1). And while Holcomb suspected Defendant was under the influence of alcohol or drugs, the video of the stop shows that Defendant appeared to understand Holcomb when he advised him of his *Miranda* rights and understood the questions that Holcomb was asking him such that he was not so impaired that he did not understand his *Miranda* rights or the

41

consequences of waiving them.  In fact, when Holcomb and another officer twice asked him for consent to search his vehicle, Defendant refused to give that consent and the officers honored that refusal until after he was arrested, thus demonstrating that he understood that he could refuse to waive his rights and that he did not feel so coerced by Holcomb's actions that he simply acquiesced to his show of authority. The undersigned therefore finds that Defendant voluntarily and knowingly waived his rights under *Miranda* and that any statements Defendant made after Holcomb advised him of his *Miranda* rights were made voluntarily.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his statements on Fifth Amendment grounds be **DENIED**.

### Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendant's Motion To Suppress (Doc. 16) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 8th day of November, 2018.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

42